# United States District Court

DISTRICT OF COLUMBIA

In re one Porsche automobile, VIN
WP0AB29953S696097; one Coach House
RV, model 272XL, VIN 1FDXE45S64HBO856;
one Cadillac Escalade, VIN
3GYEK62N24G175910

       **(Under Seal)**

       **AFFIDAVIT FOR**
       **SEIZURE WARRANT**

       **Case number:**

I, Affiant Special Agent Randolph O. Gregory, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

  1.  Your Affiant, Randolph O. Gregory, Jr., is a Special Agent with the Internal Revenue Service, Criminal Investigation Division (IRS-CID). Your Affiant's responsibilities include the investigation of possible criminal violations of the Internal Revenue Laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), the Money Laundering Control Act (Title 18, United States Code) and related offenses.

  2.  I have been a Special Agent with the IRS-CID for over 3 years. Prior to that, I was a Special Agent with the Treasury Inspector General for Tax Administration for 3 years. I have personally conducted or assisted in investigations of alleged criminal violations of U.S. law, including the Money Laundering Control Act of 1986, codified at 18 U.S.C. §§ 1956 and 1957.

1

I am familiar with the facts and circumstances set forth below from my participation in the investigation of STEIN and others, as well as through conversations with other law enforcement agents, in particular agents of the Office of the Special Inspector General for Iraq Reconstruction (SIGIR) and Immigration and Customs Enforcement (ICE), and through reviewing evidence obtained during the course of the investigation.  This Affidavit is being submitted for the limited purpose of seizing proceeds of the money laundering conspiracy, or property traceable thereto, based upon probable cause to believe that STEIN has knowingly conspired to violate the criminal laws of the United States, namely, conspiring to violate 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 2314 (interstate transportation of stolen property) in violation of 18 U.S.C. § 371 (conspiracy); and for conspiring to violate 18 U.S.C. § 1956 and § 1957, in violation of 18 U.S.C. § 1956(h) (conspiracy to commit money laundering). Therefore, I have not included the details of every aspect of this investigation but only those facts to support probable cause.  Where conversations or statements are related herein, they are related in substance and in part only unless otherwise indicated.

   3.  During all relevant times, Robert J. STEIN, Jr. (hereinafter "Stein") was the Comptroller and Funding Officer for the Coalition Provisional Authority – South Central Region (CPA-SC) in Al-Hillah, Iraq.  In this capacity, STEIN served as a United States government contract employee.  As both Comptroller and Funding Officer, STEIN was responsible for and directed the expenditure of funds for contracts awarded in Al-Hillah, Iraq.  Between October 2003 through June 2004, STEIN controlled the expenditure of approximately $82 million dollars in currency which was to be used for payment of contract services rendered in Al-Hillah, Iraq.  These monies were received from the Development Fund for Iraq (DFI) Office, located in Baghdad, Iraq.

4. This Application for a Criminal Complaint arises from a criminal investigation of STEIN and others following an audit in late 2004. The investigation has revealed that contracts were awarded to businesses controlled by Co-conspirator One through a rigged bidding process, that the contracts were authorized for payment by STEIN and his co-conspirators (in some cases without any performance of the contracts by Co-conspirator One's companies), and that Co-conspirator One, through his businesses and personal bank accounts, paid kickbacks and bribes, and provided gratuities, to government officials, including STEIN. In his capacity as the Comptroller and Funding Officer, STEIN directed the expenditure of funds for every contract awarded to Co-conspirator One's businesses in Al-Hillah, Iraq.

    a. Witness A is an Iraqi business owner who conducted business in Al-Hillah, Iraq and was personally familiar with the contracting processes conducted by STEIN, Co-conspirator One, and other public officials in the CPA-SC Region.

    b. Co-conspirator One is a United States citizen, who operated or controlled several construction and service companies in Iraq and Romania. Co-Conspirator Two is a public official who worked with STEIN and was involved in the awarding and approval of contracts in the CPA-SC Region. On November 13, 2005, Co-conspirator One admitted transferring funds representing stolen property to various CPA officials, including STEIN and Co-conspirator Two. Co-conspirator One further stated that had he not transferred such funds, he would not have obtained the CPA South Central Region contracts over which STEIN had authority to disburse funds.

    c. Co-conspirator Two has been cooperating with your complainant and other law enforcement officers involved in the investigation of this matter. Co-conspirator Two

has admitted to investigators that he has unlawfully received cash and goods from Co-conspirator One in return for using his official position to help obtain CPA-SC Region contracts for Co-conspirator One's companies.

5. The investigation has revealed that there were no legitimate competing bids for any of the contracts awarded to Co-conspirator One. Rather, according to Witness A and Co-conspirator Two, all of the bids awarded to Co-conspirator One were rigged by STEIN and other co-conspirators through the submission of fake or excessively "high" bids designed to enable Co-conspirator Two and others to award the winning "low" bid to Co-conspirator One or companies under his control.

6. The investigation has further revealed that STEIN and others would engage in unlawful acts to fraudulently award contracts and make fraudulent payments, or cause fraudulent payments to be made, on those contracts to Co-conspirator One. The contracts were purported to be for the rebuilding and stabilization of Iraq, including but not limited to the renovation of the Karbala Public Library, demolition work and the construction of the Al Hillah Police Academy, the upgrading of security at the Al Hillah Police Academy, and the construction of the Regional Tribal Democracy Center. With the assistance of STEIN and others, including several public officials, Co-conspirator One would submit and cause to be submitted numerous bids on the same contract in the names of different companies all controlled by Co-conspirator One or by companies which did not exist. The bids would include a "high" bid and several "low" bids which enabled STEIN and his co-conspirators in their official capacities to ensure that the contract was awarded to Co-conspirator One or a company under his control. The value of these contracts ranged up to $498,900. As Comptroller and Funding Officer, STEIN's approval authority for awarding contracts was limited to contracts less than

$500,000.

7. The investigation has further revealed that STEIN and others, without proper authority, would request and authorize payment to Co-conspirator One's companies, including payments in advance of performance and despite defective performance of the contracts by Co-conspirator One's companies.  Co-conspirator One, acting directly or through businesses he controlled, and in return for official action by STEIN and others, would pay bribes, kickbacks or gratuities to STEIN and others, including but not limited to the transfer of funds from foreign bank accounts in Iraq, Switzerland, Romania and Amsterdam to a bank in the United States, including accounts in the United States in the names of STEIN and/or his spouse or other third parties.

8. Between January and June 2004 through the official efforts of STEIN and others, Co-conspirator One received at least $3,500,000 in payment for numerous contracts awarded by the CPA South Central Region of Iraq to companies owned by Co-conspirator One or under his control. The investigation has revealed that STEIN structured the contracts he and his co-conspirators had awarded to Co-conspirator One in amounts structured to be under $500,000 in order to avoid scrutiny by CPA Baghdad and other official auditors by keeping the value of all of the contracts beneath STEIN's contract authority and thereby avoiding higher level scrutiny of the fraudulently awarded contracts.  The investigation has further revealed that STEIN would authorize specific payments to Co-conspirator One on CPA Form 44, a form which was designed and intended for small purchases not more than $15,000.  The payments authorized by STEIN grossly exceeded this $15,000 purchase limit. On or about May 30, 2004, STEIN's approval authority was revoked for failure to account for the funds entrusted to him.

9. The investigation has further revealed that the bid rigging and bribery scheme

included, but was not limited to, the following contracts:

    a. On or about January 7, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8023 ("8023"), to an entity controlled by Co-conspirator One in the amount of $497,500. The purpose of contract 8023 was to provide for construction of the Regional Tribal Democracy Center. Business records show that on or about January 7, 2004, STEIN authorized a $200,000 cash payment to Co-conspirator One on CPA Form 44, a form which was designed and intended for small purchases less than $15,000. Business records also show that on or about January 12, 2004, STEIN authorized a second payment to Co-conspirator One on CPA Form 44 in the amount of $100,000. Further, on or about March 12, 2004, STEIN authorized a third payment to Co-conspirator One on CPA Form 44 in the amount of $97,500. By using CPA Form 44, the CPA was unaware that STEIN was entering into contracts for these large amounts. By avoiding CPA oversight, STEIN's approval of payments of funds to Co-conspirator One was not revealed to the CPA and its auditing arm. It is believed that STEIN was attempting to avoid detection that almost certainly would have occurred as a result of routine audits had he used the proper procedures and forms for purchases of this nature and amount. A review of the submitted bids for contract 8023 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by Co-conspirator One or did not exist. This analysis was confirmed by Co-conspirator Two. Further, other than the businesses controlled by Co-conspirator One, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format.

   b. On or about January 20, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8063 ("8063"), to an entity controlled by Co-conspirator One in the amount of $95,000.  The purpose of contract 8063 was to provide a 500kv generator for the new Babil Government building.  Based upon interviews of Witness A and Co-conspirator Two, it was learned that there were no legitimate competing bids for this contract.  A review of the submitted bids for contract 8063 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by Co-conspirator One or did not exist.  This analysis was confirmed by Co-conspirator Two.  Further, other than the businesses controlled by Co-conspirator One, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format.  Business records show that on or about January 13, 2004, STEIN authorized a $55,000 cash payment to Co-Conspirator One on CPA Form 44, which prohibited its use for expenditures beyond $15,000.  As noted, the payment for this work was made on January 13, 2004 -- days before the contract was even signed on January 20th.  Business records also show that on or about January 20, 2004, STEIN authorized a $40,000 cash payment to Co-conspirator One, also on CPA Form 44.

   c. On or about January 31, 2004, the CPA-SC Region awarded contract number DABV01-04-R-8090 ("8090") to an entity controlled by Co-conspirator One in the amount of $105,000.  The purpose of contract 8090 was to provide a 500kv generator for the Regional Tribal Democracy Center building.  Based upon interviews of Witness A and Co-conspirator Two, it was learned that there were no legitimate competing bids for this contract.  A review of the submitted bids for contract 8090 reveals that they all

7

appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by Co-conspirator One or did not exist. This analysis was confirmed by Co-conspirator Two. Further, other than the businesses controlled by Co-conspirator One, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format. Moreover, business records show that the first payment was authorized before the contract was even approved. Further, those records reveal that on or about January 13, 2004, STEIN authorized a $55,000 cash payment to Co-conspirator One on CPA Form 44, well above the $15,000 limit. Business records also show that on or about February 1, 2004, STEIN authorized a second such payment to Co-conspirator One in the amount of $50,000, also on CPA Form 44.

      d. On or about February 20, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8167 ("8167") to an entity controlled by Co-conspirator One in the amount of $452,800. The contract called for the demolition of the Ba'ath Party Headquarters and the final grading of the future Al Hillah Police Academy. Based upon interviews of Witness A and Co-conspirator Two, it was learned that there were no legitimate competing bids for this contract. A review of the submitted bids for contract 8167 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by Co-conspirator One or did not exist. This analysis was confirmed by Co-conspirator Two. Further, other than the businesses controlled by Co-conspirator One, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format. The certificate of completion for this work was dated

February 19, 2004, the day before the contract was signed on February 20th. Business records show that on or about February 21, 2004, Co-conspirator One received a cash payment of $452,800 under this contract, authorized by STEIN on CPA Form 44.

    e. On or about March 15, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8265 ("8265") to an entity controlled by Co-conspirator One in the amount of $448,500. The contract called for upgrades to the security facility for the Al Hillah Police Academy. Based upon interviews of Witness A and Co-conspirator Two, it was learned that there were no legitimate competing bids for this contract. A review of the submitted bids for contract 8265 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by Co-conspirator One or did not exist. This analysis was confirmed by Co-conspirator Two. Further, other than the businesses controlled by Co-conspirator One, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format. Business records show that on or about March 15 and April 5, 2004, respectively, STEIN authorized payments of $200,000 and $248,500 in currency under the contract to Co-conspirator One, again on CPA Form 44.

    f. On or about March 30, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8339 ("8339") to an entity controlled by Co-conspirator One in the amount of $373,400. The contract called for the renovation of the existing library in Karbala, Iraq. Based upon interviews of Witness A and Co-conspirator Two, it was learned that there were no legitimate competing bids for this contract. A review of the submitted bids for contract 8339 reveals that they all appear to be fraudulent

because the businesses purporting to bid on the contract were either controlled by Co-conspirator One or did not exist.  This analysis was confirmed by Co-conspirator Two.  Further, other than the businesses controlled by Co-conspirator One, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format.  Business records show that on or about March 30, 2004, STEIN authorized payment on CPA Form 44 to Co-conspirator One in the amount of $373,400.

     g. On or about April 1, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8342 ("8342") to an entity controlled by Co-conspirator One in the amount of $197,500.  The contract called for the landscaping of the existing library in Karbala, Iraq.  Based upon interviews of Witness A and Co-conspirator Two, it was learned that there were no legitimate competing bids for this contract.  A review of the submitted bids for contract 8342 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by Co-conspirator One or did not exist.  This analysis was confirmed by Co-conspirator Two.  Further, other than the businesses controlled by Co-conspirator One, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format.  Business records show that on or about April 1, 2004, STEIN authorized the payment on CPA Form 44 of $197,500 to Co-conspirator One.

     h. On or about April 1, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8343 ("8343") to an entity controlled by a Co-conspirator One in the amount of $224,010.  The contract called for the existing library in Karbala, Iraq to be

outfitted with furniture.  Based upon interviews of Witness A and Co-conspirator Two, it was learned that the bidding process for this contract was false and fraudulent, because Co-conspirator One or other co-conspirators caused to be submitted all of the bids in the names of non-existent entities or a company that Co-conspirator One controlled or influenced, ensuring that the contract would be awarded to Co-conspirator One.  On or about April 1, 2004, Co-conspirator One was paid $224,010.  Again, the payment was authorized by STEIN on CPA Form 44.

      i.  On or about April 3, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8345 ("8345") to an entity controlled by Co-conspirator One in the amount of $498,900.  The contract called for the installation of internet capabilities in the existing library in Karbala, Iraq.  Based upon interviews of Witness A and Co-conspirator Two, there were no legitimate competing bids for this contract.  A review of the submitted bids for contract 8345 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by Co-conspirator One or did not exist.  This analysis was confirmed by Co-conspirator Two.  Further, other than the businesses controlled by Co-conspirator One, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format.  On or about April 3, 2004, business records show that STEIN authorized the payment of $498,900 on CPA Form 44 to Co-conspirator One.

10.  Co-conspirator One directly paid or arranged for the payment of bribes, kickbacks, and gratuities, amounting to at least $200,000 per month, to CPA-SC Region officials, including STEIN, Co-conspirator Two and others, in order to obtain contracts,

including the contracts described above.  Payments from Co-conspirator One to various government officials have been corroborated by Witness A, Co-conspirator Two, and other persons with personal knowledge of the payments and through reviewing various financial records.  For example, I am aware that Co-conspirator One, who controlled the entities which received the contracts described herein, and who paid the aforementioned bribes, kickbacks and gratuities, caused the transfer of funds totaling more than $477,000 from foreign bank accounts to bank accounts in the United States in the name of STEIN or his spouse, or his companion, Ms. Esther Crane.  In addition, your Affiant has personally reviewed or is aware of financial records which, among other things, detail transfers from entities controlled by Co-conspirator One made on behalf, or for the benefit of, STEIN, including a wire transfer of $140,000 to a realty company in connection with the purchase of real property in North Carolina by, or on behalf of, STEIN.  Additionally, a purchase waiver was executed on behalf of Stein for this property which stated the following: "If Mr. Robert Stein is killed prior to returning home on or before May 1, 2004, Ms. Esther Crane", STEIN'S companion, "will be allowed to terminate the "Offer to Purchase Contract" dated March 19, 2004."  Furthermore, on a change order for the previously mentioned property dated April 7, 2004, STEIN and his companion are listed as the owner of said property.  A signature for STEIN'S companion also appears on this said change order.  In an e-mail dated April 23, 2004, STEIN advises the realtor that he and his companion are interested in purchasing a lot of land located behind the aforementioned property for an additional $20,000.  STEIN further writes the following: "if I need to transfer additional funds I will on Monday to cover all of the additional expenses."  STEIN signs the e-mail as the Chief, Current Operations and Infrastructure, Coalilition Provisional Authority, South Central Iraq.

11. A Seizure Warrant was executed with respect to a number of properties directly traceable to the above-detailed scheme on or about November 15, 2005. Since that time, I have learned that additional transactions, set forth in the following paragraphs, also involved proceeds of the scheme to defraud.

12. Funds were sent to Colonial Cadillac & Hyundai on behalf of DEBRA M. HARRISON on the following dates and in the following approximate amounts from foreign bank accounts controlled by Co-conspirator One:

| Date | Amount | Originator | Recipient |
| --- | --- | --- | --- |
| Aug 10, 2004 | $9,380 | Entity controlled by Co-conspirator One | Auto Dealership |
| Aug 19, 2004 | $9,380 | Entity controlled by Co-conspirator One | Auto Dealership |
| Aug 24, 2004 | $9,380 | Entity controlled by Co-conspirator One | Auto Dealership |
| Aug 24, 2004 | $9,380 | Entity controlled by Co-conspirator One | Auto Dealership |
| Aug 25, 2004 | $9,380 | Entity controlled by Co-conspirator One | Auto Dealership |
|  |  |  |  |

13. In addition to the transactions noted above, the following financial transactions were conducted, demonstrating that the payments were for the benefit of STEIN by Co-conspirator One directly or through businesses that he controlled or controls, in the approximate amounts below:

| Date | Amount | Originator | Recipient |
| --- | --- | --- | --- |
| April 26, 2004 | $9,475 | Entity controlled by Co-conspirator One | Porsche Owner |
| April 26, 2004 | $81,087.85 | Entity Controlled by Co-conspirator One | Porsche Owner |
| July 20, 2004 | $14,968 | Entity controlled by Co-conspirator One | RV Dealership |
| Sept 13, 2004 | $124,962 | Entity controlled by Co-conspirator One | RV Dealership |
| Sept 30, 2004 | $8,500 | Entity controlled by Co-conspirator One | RV Dealership |

14. Based upon your Affiant's experience, I believe that the financial and monetary transactions described above are part of a conspiracy to violate United States law, including but not limited to 18 U.S.C. § 1343 and § 2314, in violation of 18 U.S.C. § 371, and a money laundering conspiracy to violate Sections 1956 and 1957 of Title 18, United States Code. I

believe that STEIN and others caused or facilitated such financial transactions, which involved the proceeds of specified unlawful activities, namely, the interstate transportation of stolen financial funds (18 U.S.C. § 2314) and wire fraud (18 U.S.C. § 1343) in order to conceal the source and origin of the funds and to promote further unlawful activity. In addition, I believe that STEIN and others caused or facilitated monetary transactions involving criminally derived property, by through or to financial institutions, in amounts exceeding $10,000.

15. Accordingly, pursuant to Title 18, U.S. Code, Section 981(a)(1)(A), any property, real or personal, involved in such transactions in a violation of Section 1956 or 1957, or any property traceable to such property, is subject to forfeiture including the following:

   A. One Porsche automobile, VIN WP0AB29953S696097;

   B. One Coach House RV, model 272XL, VIN 1FDXE45S64HBO856; and

   C. One Cadillac Escalade, VIN 3GYEK62N24G175910


Signature of Affiant: _____
**Randolph O. Gregory, Jr.**
**Special Agent, IRS Criminal Investigation**

Approved:   Richard Weber, Chief
            Mark J. Yost, Trial Attorney
            Patrick T. Murphy, Trial Attorney
            Asset Forfeiture and Money Laundering Section

            Noel L. Hillman, Chief
            James A. Crowell IV, Trial Attorney
            Ann C. Brickley, Trial Attorney
            Public Integrity Section

            Paul Pelletier
            Fraud Section, Criminal Division, U.S. Department of Justice


**Sworn to before me and subscribed in my presence on Nov. ___, 2005, at Washington, D.C.**

Signature: _____          _____, Magistrate Judge